UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In Re: | ) | Case No. 14-51862 |
| | ) | |
| Joseph D. Romaniello, | ) | Chapter 11 |
| | ) | |
| Debtor | ) | November 30, 2016 |

**FOURTH AMENDED DISCLOSURE STATEMENT**

On December 9, 2014, Joseph D. Romaniello ("Debtor"), filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code (11 U.S.C. §101 et. seq.) (the "Code") with the United States Bankruptcy Court for the District of Connecticut (The Court).  The Debtor has filed, together with this Fourth Amended Disclosure Statement, his proposed Fourth Amended Plan of Reorganization (The "Plan").  Pursuant to §1125 of the Code, the Debtor has prepared and filed this Fourth Amended Disclosure Statement (The "Statement") along with the Plan for the Court's approval for submission to the holders of claims and interests with respect to the Debtor and his assets. The purpose of this Statement is to provide the holders of claims against or interests in the Debtor with adequate information about the Debtor and the Plan to make an informed judgment about the merits of approving the Plan.

**NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO THE VALUE OF ITS PROPERTY) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR. THE INFORMATION CONTAINED IN THIS STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT ANY INACCURACY ALTHOUGH EVERY EFFORT HAS BEEN MADE TO BE ACCURATE.  APPROVAL OF THIS DISCLOSURE STATEMENT BY**

**THE COURT DOES NOT CONSTITUTE A RECOMMENDATION AS TO THE MERITS OF THE PLAN.**

## ARTICLE ONE
## GENERAL HISTORY

Joseph D. Romaniello is involved in the auto industry as a towing and auto body repair shop, two distinct businesses, one East Coast Towing and the other Lafayette Auto Group. He owns 100% of each. The companies generated sufficient funds to service all debt and to pay its obligations currently in the past. However, in 2009 through 2011 business slowly deteriorated due to the loss of contracts and reduced business. Foreclosures ensued from First County Bank against property at Taff Avenue and Lafayette Street. In addition, a $118,000 line of credit to First County Bank filed against Mr. Romaniello's home also went into default. The foreclosures called for sales in or about December 2014. Prior to the auction sales occurring this chapter 11 was filed. Mr. Romaniello believed substantial equity existed in his properties and he wished to preserve the equity for himself and to insure all creditors were paid in full.

Since the filing of the chapter 11 the companies have paid off the line of credit against Mr. Romaniello's house. Further, the property at Taff Avenue was sold for $998,000, significantly higher than First County Bank's appraisal and the expected amount to be recovered as part of the foreclosure auction. After paying the second mortgage against the property and all other claims there is approximately $200,000 remaining to help pay administrative expenses and help fund the Plan.

Also, since the time of the initial filing the Debtor, by selling the Taff property, has consolidated operations at Lafayette Street. This cuts down significantly on business costs and expense. Further, as per the projections attached hereto and made a part hereof, the companies have trimmed operations and increased sales. Under the circumstances, the Debtor feels that the two companies in which he owns one

hundred (100%) percent interest will have sufficient revenue to pay some or all of the rent for the Lafayette Street property.

# ARTICLE TWO
# PLAN OF REORGANIZATION

1. **Code:** Code shall mean the Bankruptcy Reform Act of 1978 which has been codified as Title 11 of the United States Code.

2. **Confirmation:** Confirmation shall mean the date on which this Plan is confirmed by Order of the Court.

3. **Court:** Court shall mean the United States Bankruptcy Court for the District of Connecticut including the United States Bankruptcy Judge presiding therein.

4. **Effective Date of the Plan:** Effective Date of the Plan shall mean the first business day following the last day on which an appeal from an Order of the Court confirming this Plan may be taken under applicable law and no such appeal has been taken or if such an appeal has been taken, the first business day following the date upon which such appeal has been exhausted and the Plan may Proceed.

5. **Date of Confirmation of the Plan:** Date of Confirmation of the Plan shall mean that date upon which the Court approves the Debtor's plan.

6. **Voting, Cram Down and Confirmation**
    a. **Voting**

    In order to obtain confirmation of the Plan by the Bankruptcy Court, the Plan must be accepted by the Creditors, assuming that their claims are allowed. Of those creditors who have allowed claims and actually vote on the Plan, creditors holding at least two-thirds in dollar amount of the allowed claims and who constitute more than one-half in number of such voting creditors must vote for the Plan in order for the Plan to be confirmed.

    Administrative claims are to be paid in full upon confirmation; they are not impaired under the Plan and are deemed to have accepted the Plan. Creditors within a class vote as part of a class.
    b. **Cram Down**

    If any class should fail to accept the Plan by the required majority, the court may, under Sec. 1129(b) of the Bankruptcy Code, nonetheless confirm the Plan if at least one impaired class has accepted the Plan and the court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to any impaired class which has not accepted the Plan. A plan is "fair and equitable" within the meaning of this section if it provides as to a dissenting class of secured creditors, retention of the lien securing the claim in the allowed amount of the claim, and payment of deferred cash payments totaling the allowed amount of such claim and having a value, as of the effective date of the Plan, of its collateral. As to a dissenting class of unsecured creditors, a Plan is "fair and equitable" if it receives property of a value, as of the effective date of the Plan, equal to the allowed amount of its claims, or the holders of claims in junior classes will receive or retain nothing under the plan. The rule that junior classes receive

3

or retain no property is sometimes called the absolute priority rule".  However, an exception to this rule exists where either the plan provides for a liquidation or a junior class makes a "substantial" contribution of new money or property into the debtor as part of a plan of reorganization, and this exception may provide an opportunity to existing shareholders of the debtor who wish to retain an equity interest in the Company.  The Company intends to invoke these "cram down" provisions against any class, secured or unsecured, that fails to accept the Plan.

To the extent that the word "impaired" is used, impaired is defined in 11 USC 1124 as follows except as to unfavorable treatment agreed upon by any class or claimant:

"A class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan

1  leaves unaltered, the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

2. notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default-

a. cures any such default that occurred before or after the commencement of the case under this title (11 USC 101 et seq.) other than a default of a kind specified in § 365(b)(2) of this title 11 USC 365(b)(2) or of a kind that § 365(b)(2) expressly does not require to be cured;

b. reinstates the maturity of such claim or interest as such maturity existed before such default;

c. compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

d. if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to §365(b)(1)(A), compensates the holder of such claim or such interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

e. does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

The major objectives of the Debtor's Plan of Reorganization are:
1. Payment to and protection of the interests of the secured creditors;
2. Payment of all obligations to the taxing authorities;
3. The payment of all priority and administrative claims;
4. Payment of an amount to unsecured creditors that is not less than such creditors would receive in a chapter 7 liquidation on the effective date of the Plan.  The following is a brief summary of the Plan and should not be relied upon for voting purposes. Creditors are urged to read the Plan in full. Creditors are further urged to consult with counsel or with each other in order to fully understand and evaluate the Plan.

All creditors who are listed in the Debtor's schedules filed with the Bankruptcy Court may vote on the Plan whether or not they have filed Proofs of Claim, except in those instances where the schedules reflect that the claim is disputed, unliquidated, contingent or where objections to claims have been filed. Further, all creditors who are listed in the schedules will receive payment pursuant to the Plan whether or

4

not a Proof of Claim was filed, except in those instances where the schedules reflect that the Creditor's claim is disputed, contingent, or unliquidated.  In the case where objections to claims have been made by the Debtor, payments will be made in accordance with the Plan upon a final decision by the court as the allowed amount. Where a Proof of Claim is filed in an amount which is different from that set forth in the Company's schedules, or is filed as a claim which its schedules are disputed, contingent or unliquidated, the same may be subject to objection, and after a hearing thereon, may be either allowed, reduced or disallowed by the Court and the amount determined in that instance will establish the amount to be paid to the Creditors pursuant to the Plan.

## ARTICLE THREE
## PRE-PETITION DEBT

The following claims were taken from the Company's schedules and from the proofs of claims filed. Where they conflict, the amounts from the proofs of claim have been used.

## ARTICLE FOUR
## CLASSIFICATION OF CLAIMS AND INTERESTS

1. **Administrative Claims as defined in Section 503(b) of the Code**

These claims include the claims of the Debtor's bankruptcy counsel, Zeldes, Needle & Cooper, P.C., whose total is estimated to be $100,000 to date.  Court approval of the allowance of all of the above claims is required.  These claims will be paid in full on the sooner of their allowance or confirmation of the Plan. Any entity herein may elect to receive payment over a period of time or a different treatment.

2. **Priority Claims - Priority Claims under 507(a)(8) of the Code**

These are the claims for income taxes by the Internal Revenue Service and the State of Connecticut, Department of Revenue Services as well as any real estate taxes due any municipality in which the Debtor owns real property.  There are no known claims at this time.

3. **Secured Claims**

    A. **Secured Claim - Class 1** – consists of Wells Fargo, N.A. which has a fully secured mortgage on 457 Pepper Ridge Road, Stamford, Connecticut in the approximate amount of $164,000 as of July 1, 2016.

    B. **Class 2** – Consists of Wells Fargo, N.A. which has a fully secured mortgage on 15 Taff Avenue, Stamford, Connecticut, a multi-family house, in the current amount of $313,000.

4. **General Unsecured Claims**

    A.    **Class 3 – General Unsecured Claim – Third Party Payor** – consists of the First County Bank (the "Bank") which has a fully secured mortgage on 20 Lafayette Street, Stamford, Connecticut owned by Romaniello Industries in the approximate amount of $988,000 as of June 8, 2016. The Bank is fully secured, but on the real estate owned by Romaniello Industries, not the Debtor. Debtor owns one hundred (100%) percent of Romaniello Industries and is a guarantor of all obligations due to the Bank. As such, the Debtor has separately classified the Bank as an unsecured creditor as it is vis-à-vis the Debtor. The Bank and the Debtor agree to the treatment described hereinafter, which includes the Debtor posting his home located at 457 Pepper Ridge Road, Stamford, Connecticut and granting an additional cross-collateralization mortgage in the amount of $300,000.

    B.    **Class 4 – General Unsecured Claim – Third Party Payor** - consists of the Small Business Administration (the "SBA") which has a fully secured second mortgage in the approximate amount of $575,000 as of July 1, 2016. The SBA is fully secured but on the real estate owned by Romaniello Industries, not the Debtor. Debtor owns one hundred (100%) percent of Romaniello Industries and is a guarantor of all obligations due to the SBA. As such, the Debtor has separately classified the SBA as an unsecured creditor as it is vis-à-vis the Debtor. The Debtor agrees to the treatment described herein, which includes the further obligation by Debtor to pay this obligation should Romaniello Industries fail to pay.

    C.    Class 5 – **General Unsecured Claims** - consists of general unsecured claims in the total amount of $20,802.72 (Rocky Genovese - $20,000, CL&P - $373.76 and Yankee Gas - $428.96).

5.    **Class 6 - Equity Interest of Debtor**

The Debtor will continue to own his equity in the assets of the estate. Upon confirmation, all property shall re-vest in the Debtor subject to the liens of record and the terms and conditions of the Plan.

### ARTICLE FIVE
### TREATMENT OF CLASSES AND INTERESTS NOT IMPAIRED UNDER THE PLAN

1.    **Administrative Claims.**

Administrative claims shall be paid in full upon the Effective Date of this Plan or as otherwise provided herein or upon allowance by the court, whichever is later. Any entity herein may elect to receive payment over a period of time or a different treatment.

2.    **Priority Claims.**

6

None.

3  **Secured Claim - Class 1 – Wells Fargo Bank, N.A.-Approximate Amount $164,000.**

As to Class 3, the Debtor will continue to pay the allowed fully secured creditor in full in accordance with its note and mortgage and the terms therein. To the extent that the lender is already escrowing for taxes and insurance and Debtor has paid the same with the monthly mortgage payments, this will continue under the Plan, otherwise taxes and insurance will be paid as they become due. The secured creditor shall retain its lien. This claim is current. Upon default of the underlying loan terms and or upon confirmation, whichever occurs first, the automatic stay under section 362 of Code shall no be applicable so that lender may proceed with its default rights against Debtor without further order of this Court. Class 3 is unimpaired. *See* **Exhibit A** attached hereto and made a part hereof.

4. **Owner of the Equity – Class 6**

The Debtor will continue to own his equity in the assets of the estate. Upon confirmation, all property shall revest in the Debtor subject to the liens of record and the terms and conditions of the Plan. *See* **Exhibit A**.

5. **U.S. Trustee Fee -** All moneys due the U. S. Trustee pursuant to 28 USC 1930 will be paid on the Effective Date of the Plan and payments will continue until the entry of a final decree. *See* **Exhibit A**.

6. **Objections To Claims** - Objections to claims shall be filed with the Bankruptcy Court on or before November 30, 2016 or later as allowed by the Court and served upon the holder of each Claim to which the Debtor objected.

## ARTICLE SIX
## TREATMENT OF CLASSES AND INTERESTS IMPAIRED UNDER THE PLAN

1. **Secured Claims - Impaired**

    A. **Secured Claim – Class 2**

Approximate amount of claim is $313,000. Treatment of the allowed secured claim of Wells Fargo, N.A. shall be paid in accordance with the current monthly payments due to Wells Fargo, N.A. Wells Fargo, N.A. shall retain its lien on 15 Taff Avenue, Stamford, Connecticut to the same effect, validity and priority such lien has as of the Petition Date as set forth in this paragraph. Arrearages totaling $24,330.32 as of October 31, 2016 shall be repaid over a period of twelve (12) months together

with 5.25% interest in equal monthly installments of $2,085.65.  In the event any additional arrearages become due up to and including the date of confirmation, said additional arrearages shall be repaid according to this repayment schedule.  To the extent that the lender is already escrowing for taxes and insurance and Debtor has paid the same with the monthly mortgage payments, this will continue under the Plan, otherwise taxes and insurance shall be paid as they become due.  Upon default of the underlying loan terms and or upon confirmation, whichever occurs first, the automatic stay under section 362 of Code shall not be applicable so that lender may proceed with its default rights against Debtor without further order of this Court. This claim is impaired.  *See* **Exhibit A**.

    2.        **General Unsecured –**

        A.        **Class 3 -First County Bank**

        Amount due as of November 1, 2016 is $972,460.83.

Treatment:  The allowed claim of the Bank shall be paid in accordance with the current monthly payments prior to default over five (5) years, which payments shall commence on the Effective Date.  As of the Effective Date, each monthly payment shall be in the amount of $7,485.94, which amount may be modified pursuant to the terms of the note and which amount includes an escrow for real property tax payments.  The Bank further shall have the right to require that future monthly payments include a payment for escrowed property insurance.  In addition, on the Effective Date, the Bank shall be paid $75,000.00 from the proceeds on hand.  The Bank shall retain its lien on 20 Lafayette Street, Stamford, Connecticut (the "Lafayette Property") to full extent, validity and priority such lien had as of the Petition Date to secure all payments due by Debtor to the Bank.  In addition, to further secure the payments due by Debtor to the Bank, the Debtor and his spouse shall grant to the Bank a mortgage in the amount of three hundred thousand dollars ($300,000.00) on their residence at 457 Pepper Ridge Road, Stamford, Connecticut, which mortgage deed will be executed prior to confirmation and may be recorded on or after the Effective Date.  At the end of, or prior to the end of, the period of five (5) years following the Effective Date, the Debtor shall sell or refinance the Lafayette Property and satisfy its obligations to the Bank in full.  If not paid as part of a monthly payment, the Debtor shall pay all property insurance payments as they become due.  This claim is impaired.

    Notwithstanding the foregoing and any other provision of the Plan, the Debtor acknowledges, for the avoidance of any doubt, that following confirmation of the Plan, the Debtor's failure to make any payments when due to the Bank, or its failure to make taxes and insurance payments when and as due, shall entitled the Bank to pursue all of its contract, statutory, and common law rights with respect to the Debtor and all obligations owed by him to the Bank.  The Debtor personally and on behalf of Romaniello

8

Industries, LLC; Eastcoast Towing, Ltd.; and Lafayette Auto Group, Inc. hereby reaffirms and fully acknowledges the validity, enforceability, and priority of all of the obligations and undertakings set forth in: the Mortgage Note dated January 13, 2009 between Romaniello Industries, LLC and the Bank in the original principal amount of $770,400.00; the Mortgage Deed dated January 13, 2009 and recorded in Volume 9508 page 303 of the City of Stamford Land Records; the Guaranty dated January 13, 2009 signed by Joseph Romaniello on behalf of Eastcoast Towing, Ltd.; the Guaranty dated January 13, 2009 signed by Joseph Romaniello on behalf of Lafayette Auto Group, Inc.; the Guaranty dated January 13, 2009 signed by Joseph Romaniello; the Guaranty dated January 13, 2009 signed by Katherine Romaniello; and the Assignment of Leases and Rentals dated January 13, 2009 recorded on January 14, 2009 in Volume 9508 page 317 of the City of Stamford Land Records. The Debtor agrees and hereby stipulates that no defenses, counterclaims, or setoffs exist with respect to any of the aforementioned instruments nor with respect to any of the obligations and undertakings set forth therein. The Debtor further agrees and stipulates that the amount due to the Bank as of November 1, 2016 is $972,460.83 which is comprised of the following agreed-upon components: principal of $708,786.36; interest from 7/1/2013 to 9/17/2013, at 6.5%, of $10,110.04; interest from 9/18/13 to 11/1/2016 at 6.5% of $145,891.86; late charges of $600; escrow balance of $ 82,603.02; and attorneys' fees of $24,469.55).

        B.    **Class 4 - The SBA**

Approximate amount of claim as to June 1, 2015 is $575,000. This Class is not a secured debt of Debtor, but is a debt guaranteed by Debtor. This Class will be paid by a related third party as follows: SBA shall be paid in accordance with the current monthly payments prior to default over a five (5) year period which payments shall commence on the Effective Date. The SBA shall be paid $25,000.00 from proceeds on hand in addition to the monthly payment. The SBA shall retain its lien on Lafayette Street to the same extent, validity and priority such lien had as the Petition Date to secure the payment as set forth in this paragraph. At the end of or prior to said five (5) year period, the property located at 20 Lafayette Street and shall be sold or refinanced satisfy the obligation in full. Taxes and insurance shall be paid as they become due. This claim is impaired This claim is impaired. *See* **Exhibits A & B**.

### C. Class 5 – Remaining Unsecured Claims

As to Class 5, the Debtor will pay all allowed unsecured claims in full within sixty (60) days of the Effective Date of Confirmation. The creditors shall receive interest at the United States District Court judgment rate which is fixed on the Effective Date.[1] *See* **Exhibit A**.

### 3. Claim Equity Holder – Class 6

Joseph D. Romaniello shall retain all equity.

## ARTICLE SEVEN
## FINANCIAL INFORMATION

### A. Executory Contracts

All executory contracts not specifically rejected in the Plan or objected to prior to confirmation shall be assumed by the confirmation of the Plan.

### B. Debtor's Income

Debtor Joseph D. Romaniello's personal annual income is estimated to be $104,000 gross, $73,279 net. Debtor's estimated income amount is predicated the accountant's analysis of Debtor's historical income. Such amount may have a downward departure when viewed against certain past MOR's, but the same is consistent with Debtor's accountant's projections based on historical income information. *See* **Exhibit A**.

## ARTICLE EIGHT
## MEANS FOR THE EXECUTION OF THE PLAN

### A. Means for the Execution of the Plan

**1. Sources of Cash for Plan Distributions**. The payments required under the Plan will be made from the Debtor's income, cash on hand and with respect to Lafayette Street, the leasing of the property to an unrelated third party for one-third of the space and from the Debtor's related corporations which proceeds shall be enough generated by the Debtor to make the payments in accordance with the treatment of each of the secured creditors. *See* **Exhibit A** and **Exhibit B**.

The property located at 20 Lafayette Street, Stamford, Connecticut, which is encumbered by First County Bank and an SBA loan is divided into two sections which square footage is roughly equivalent to

two-thirds and one-third. The Debtor will lease the property located in the one-third section for approximately $3,000 to $3,500 per month. The Debtor has several interested parties and should be entering into a commitment to lease on or before September 1, 2016.

Romaniello agrees, as a contractually bound party to the Plan, to fund the amount of any shortfalls to First County Bank and the SBA within thirty (30) days of the payment due date in question provided that the shortfall, if any, will not exceed one (1) month's payment. Romaniello will fund the shortfalls out of personal funds.

Thereafter, the remaining proceeds necessary to service the first and second mortgage will be paid from the rental income obtained from East Coast Towing and Lafayette Auto Group. In accordance with projections described in **Exhibit B, Schedule 1**affixed hereto and made a part hereof, the Debtor indicates that he has the ability to pay the ongoing $8,000 per month from his business operations in order to service the indebtedness. In the event of a rental shortfall during the term of the Plan, the Debtor will provide cash payments sufficient to cover any such shortfall and maintain the payments contemplated in the Plan. Debtor's accountant has provided projections based on the information available. Such projections appear to be the best estimate based on historical information.

**2.**     The payments to be made to Wells Fargo Bank for the first mortgage on 457 Pepper Ridge Road, Stamford, Connecticut will be made as they have been throughout on a current basis from income generated by the Debtor and his wife. *See* **Exhibit A**.

**3.**     The payments to be made to Wells Fargo Bank, N.A. on 15 Taff Avenue, Stamford, Connecticut, will be made as they have been throughout on a current basis from income generated by the property. Arrearages will be made up on or before the first anniversary of the Effective Date. *See* **Exhibit B, Schedule 1**.

### B.     Management After the Effective Date

From and after the Effective Date the Reorganized Debtor shall continue to perform the management responsibilities of the Debtor.

### C.     Liquidation Analysis

**Exhibit B, Schedule 1** sets for the liquidation analysis. The liquidation analysis indicates that the Debtor has sufficient assets to pay all creditors in full. The liquidation analysis further indicates that there

---

[1] Former unsecured creditor Chase has an unsecured debt of approximately $5,000, which was paid in full by Kathy Romaniello.

is sufficient equity in both the home located at 457 Pepper Ridge Road, Stamford, Connecticut and other related entities owned by the Debtor.  *See* **Exhibit B, ¶1**.

    **D.**    **Profit History and Projection**

The Debtor plans to make payments to creditors from (i) rental proceeds of the Lafayette Street property and Taff Property and (ii) the operations of Debtor's business and his income.  The Debtor reasonably expects that sufficient revenue will be generated by cash flow from the two companies he owns in order for the Debtor to make the required payments under the Plan and that the Plan as proposed is in the best interests of its creditors.  The attainment of the objective of providing unsecured creditors with value that is not less than what would be received in a liquidation is therefore dependent on the Debtor's future profitability.

    **E.**    **Federal Income Tax Consequences to the Debtor**

The tax consequences of the Plan to the Debtor are uncertain because the range of values that may be realized on the sale of the properties is unknown. In addition, there is uncertainty as to the amount of rental income that will be received.  However, the Debtor will likely be subject to Federal income taxes, capital gain taxes and may be subject to alternative minimum taxes. The Plan provides for the payment of capital gain taxes prior to the distribution of the net proceeds from the sale of real estate.

Under the Plan, some creditors may not have their claims paid in full resulting in a discharge of indebtedness of the Debtor. Under the Internal Revenue Code of 1986 (the "Tax Code"), a taxpayer generally must include in gross income the amount of indebtedness discharged during the taxable year. However, under section 108 of the Tax Code, when the discharge of indebtedness is pursuant to a plan approved by the court in a case under Chapter 11 of the Bankruptcy Code, the amount of indebtedness is excluded from gross income. Instead, certain tax attributes of the Debtor are reduced by the amount of indebtedness discharged and excluded from income. The tax attributes to be reduced are: net operating losses, certain credit carryovers, capital loss carryovers, the basis of the taxpayer's property, and foreign tax credits.

    **F.**    **Federal Income Tax Consequences to the Creditors**

In general, a creditor may realize and recognize gain or loss on the exchange of a claim in an amount equal to the difference between the holder's basis in the claim and the amount realized. Each

creditor may recognize ordinary income to the extent it receives cash allocable to accrued interest income not previously included in their federal taxable income. Conversely, each creditor that had previously included accrued yet unpaid interest in their federal taxable income may recognize a loss to the extent such accrued unpaid interest is not paid in full. The proper allocation between principal and interest of amounts received for a claim not paid in full is unclear. Because the tax consequences of the Plan may vary based on individual circumstances, each holder of a claim is urged to consult with its own tax advisor as to the consequences of the Plan to it under federal and applicable state and local tax laws.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to the holders of Unsecured Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan *(e.g.,* Administrative Expense Claims, Priority Non-Tax Claims, and Other Secured Claims), or holders of Old Equity Interests that are extinguished without a distribution in exchange therefore.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, persons not holding their Claims, persons holding unsecured claims who are not the original holders of those Claims or who acquired such Claims at an acquisition premium, and persons who have claimed a bad debt deduction in respect of any Unsecured Claims).

13

*Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*<u>IRS Circular</u> <u>230</u> <u>Notice</u>: To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

G.    **Consequences to Holders of Allowed General Unsecured Claims Class**

In general, each holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). Pursuant to the Plan, distributions to any holder of an Allowed General Unsecured Claim will be allocated first to the original principal amount of such Claim as determined for federal income tax purposes and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued original issue discount ("OID") or accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder will generally recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full. Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of losses realized in respect of Allowed General Unsecured Claims for federal income tax purposes.

Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was originally issued at a discount or a premium, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction in respect of that Claim.

### H.  Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate. Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following: (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

**ARTICLE NINE**
**RETENTION OF JURISDICTION BY THE COURT**

The Court will retain jurisdiction until payments under this Plan have been fully made, notwithstanding substantial consummation of the plan, including but not limited to the following purposes:

a) The classification of the claim of any creditor and the re-examination of claims which have been allowed for purposes of voting, and the determination of such objects as may be filed for creditors' claims. The failure by the Debtor to object to any claim before confirmation shall not be a waiver of the Debtor's right to object to or re-examine the claim in whole or in part.

b) The determination of all questions and disputes regarding title to the assets of the estate, and determination of all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the date of confirmation, between the debtor and any other party including, but not limited to, any right of the Debtor to recover assets pursuant to the provisions of Title 11 of the United States Code.

c) The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this Plan or the order of confirmation as may be necessary to carry out the purposes and intent of this Plan.

d) The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code.

e) The enforcement and interpretation of the terms and conditions of this Plan.

f) The entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Court may deem necessary.

g) The entry of an order concluding and terminating this cause, subject only to retention of jurisdiction to enter a discharge order meeting the requirements of §1141(d)(5)(A).

h) Upon completion of his payments required under thePlan, the Debtor will seek an order from the Court as provided in §1141(d)(5)(A), discharging him of his debts treated in the Plan pursuant to §1141(d)(1)(A).

THE DEBTOR

_____//s//_____
Joseph D. Romaniello

By: _____//s//_____
   James G. Verrillo CT 08819

   Zeldes, Needle & Cooper, P.C.
   P.O. Box 1740
   1000 Lafayette Blvd.
   Bridgeport, CT. 06601-1740
   Tel: (203)332-5733
   Fax: (203)333-1489
   Email: jverrillo@znclaw.com